**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 7/16/2014 __
```

**JOSE M. CORREA,**

$\qquad\qquad$ **Plaintiff,**

$\qquad$ **-against-**

**Warden SUZANNE HASTINGS, et al.**

$\qquad\qquad$ **Defendants.**

---------------------------------------------------------------X

**13-CV-05862 (PAC)(SN)**

**REPORT AND**
**RECCOMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. CROTTY:**

$\qquad$ The plaintiff Jose M. Correa, proceeding *pro se,* filed this action on August 16, 2013,

against Warden Suzanne Hastings and Supervisor Adam Johnson, seeking money damages as

relief for the defendants' alleged violations of his Eighth Amendment rights on the grounds of

failure to protect and deliberate indifference to a serious medical condition. This action arises

from injuries Correa sustained on July 9, 2012, while a pretrial detainee housed at the

Metropolitan Correctional Center New York, where he was attacked by a prisoner with a

razorblade and subsequently received inadequate medical treatment from prison medical staff.

Before the Court is the defendants' motion to dismiss under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6).

## BACKGROUND

**I.**$\qquad$**Procedural History**

$\qquad$ Correa filed this action under 42 U.S.C. § 1983, alleging federal constitutional claims

against the defendants, Suzanne Hastings, the former Warden of the Metropolitan Correctional

Center New York (the "MCC"), and Adam Johnson, the Supervisory Staff Attorney for the Bureau of Prisons' Consolidated Legal Center New York, (collectively, the "defendants"). Correa attached to his original complaint ("Complaint" or "Compl.") a page copied from a Bureau of Prisons ("BOP") prisoner manual. In the section of his *pro se* complaint form titled "Parties in this complaint," Correa listed Hastings and Johnson as the only two defendants. (Compl. at 1-2.) In the case caption, though, Correa wrote on three separate lines, "Suzanne Hastings (Warden)," "Adam Johnson (Supervisor)," "MCC New York." (<u>Id.</u> at 1.) Correa's complaint was interpreted as filing claims against "MCC New York," and, on September 20, 2014, the Honorable Loretta A. Preska issued an order *sua sponte* dismissing the claims against MCC without leave to amend. The order further interpreted the complaint as alleging claims for "failure to protect" and "denial of medical care," both of which the Court dismissed with leave to amend, along with instructions to allege more specific facts. (Sept. 20, 2013 Order of Dismissal at 2-5.)

On December 6, 2013, Correa filed his First Amended Complaint (the "FAC"). In the FAC, Correa added some clarifying information in response to the form questions (FAC at 3-5), but the primary changes are the addition of a full page of allegations titled "Facts of Case for Failure to Protect," (<u>id.</u> at 8), and the submission of four new documents completed by MCC staff on July 9, 2012: (1) the "Incident Report" completed by Lieutenant D. Erny in response to the altercation that caused Correa's injuries (<u>id.</u> at 10); (2) an "Inmate Injury Assessment and Followup" form completed by hand by physician's assistant ("PA") Ysmael Joaquin ("PA Joaquin") and signed by MCC Clinical Director Anthony Bussanich, MD, ("Dr. Bussanich) the following day (<u>id.</u> at 11); (3) a typed "Clinical Encounter" report completed by PA Joaquin regarding his evaluation of Correa before hospitalization and signed by Dr. Bussanich the

following day (id. at 15-17); and (4) a typed "Clinical Encounter" report completed by PA

Joaquin regarding his evaluation of Correa after hospitalization and signed by Dr. Bussanich the

following day (id.at 12-14). This matter was reassigned to the Honorable Paul A. Crotty, who

referred it my docket on December 19, 2013, to report and recommend on dispositive motions.

On April 24, 2014, the defendants filed this motion to dismiss, attaching the Declaration

of Stephanie Scannell (the "Scannell Declaration"). The defendants move for dismissal based on

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and on their affirmative defense raised

under the Prison Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997, *et seq*. The

Court issued a scheduling order on May 6, 2014. Correa did not oppose the motion to dismiss.

On June 12, 2014, the defendants filed a letter stating that, in light of Correa's failure to oppose

the motion to dismiss, they declined to file a reply. The Court subsequently discovered that

Correa had been transferred from the MCC on June 2, 2014, and his designated institution is now

FCI Ray Brook. The defendants have re-sent their June 12, 2013 letter to Correa's current

address. Correa has not responded.

## II.    Factual Allegations

The following facts alleged by Correa in his pleadings and the documents attached

thereto are assumed to be true for the purposes of this motion to dismiss. See Bryant v. New

York State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012). In resolving this motion, the Court

does not consider the BOP manual attached to the Scannell Declaration as Exhibit A. Correa

submitted with his Complaint the page from the manual that he relied on in drafting his

pleadings. (Compl. at 9.) The Court does not find the manual submitted by the defendants, which

Scannell declares is provided to all pretrial detainees, relevant to this matter or proper to consider

upon a motion to dismiss.[1] The Court notes, however, that the manual text Correa submits as having relied on is functionally identical to the text in the handbook submitted by the defendants.[2]

Correa was a pretrial detainee housed at the MCC from March 23, 2012, through June 2, 2014. On July 9, 2012, at 6:20 p.m., Correa was arguing with another prisoner when the prisoner charged at Correa and slashed his face three times with a razorblade. The prisoner had removed the blade from the handle of one of the "'orange razors'" that the MCC issues free-of-charge to prisoners. (FAC at 9.) Correa alleges that "slashings and cuttings" by prisoners using razorblades removed from the prison-issued razors "are re-[o]ccurring on a consistent basis . . . because of prison . . . policies to freely give away multiple razors to inmates without monitoring them as other jails do or other units do . . . at MCC." (Id. at 8.) Correa further alleges that no security measures have been instituted to address "this obvious risk to prisoners' safety, even though prison officials (Suzanne Hastings and Adam Johnson) are mindfully aware of this ongoing danger." (Id.)

After the prisoner slashed Correa's face, the officer responding to the altercation placed Correa in hand restraints and brought him to the Special Housing Unit (the "SHU"). Correa

---

[1] See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (stating that, when ruling on a Rule 12(b)(6) motion, a court "must confine itself to the four corners of the complaint") (internal quotation marks omitted); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (holding that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion" and that "mere notice or possession is not enough") (emphasis in original); BLT Rest. Grp. LLC v. Tourondel, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012) (finding that the "four corners of the complaint" includes "any documents attached to that pleading or incorporated into it by reference, any documents that are 'integral' to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice").

[2] It appears that Correa submitted a page from the general prisoners' handbook and that Scannell submits the handbook for pretrial detainees. The only difference in the portion relevant to this motion is that the version submitted by Correa cites the name of the administrative form, "a BP-8," and the version submitted by Scannell does not. (Compare Compl. at 9 with Scannell Decl., Ex. A at 7.)

waited in the SHU for less than an hour before PA Joaquin performed triage to stop his bleeding.

Two correctional officers, including one Correa identifies as Lieutenant Hughes, took pictures of

Correa's face before and after PA Joaquin applied bandages. PA Joaquin completed an Inmate

Injury Assessment and Followup form, noting that Correa had three lacerations, including an 8.5

centimeter open laceration on the left side of his face. On the checklist for the item "This Injury

Required," PA Joaquin marked "Other" and wrote, "for evaluation by plastic surgeon." (Id. at

11.) PA Joaquin noted that Correa "[a]ppears [w]ell, [a]lert and [o]riented." (Id. at 15.) PA

Joaquin discussed the situation with Dr. Bussanich, who orally approved sending Correa to the

emergency room. PA Joaquin also submitted his formal report and emergency room request to

Dr. Bussanich, which he signed the next day. The reason for the request as written by PA

Joaquin was, "23 years old hispanic male with history of assault by another inmate. Has open

wounds on (L) side of the face. For evaluation by plastic surgeon." (Id. at 16.) PA Joaquin, with

Dr. Bussanich's authorization, sent Correa to the hospital.

　　Correa was transported by ambulance to New York Downtown Hospital's emergency

room, where he was treated by a plastic surgeon. The surgeon told Correa that his wounds

required 50 stitches on his face and another 15 stitches behind his ear. The surgeon gave Correa a

tetanus shot and prescribed him the medication Cephalexin, an antibiotic used to treat bacterial

infections.[3] Upon returning to the MCC from the hospital the same day, Correa was taken to the

SHU and met again with PA Joaquin for a post-hospitalization report. PA Joaquin wrote in his

report, "Patient told he received 50 stitches. Inst[ru]ctions to keep dry and clean. Sutures are

---

[3] United States National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth (last visited July 14, 2014).

absorbable. Patient needs wound check [every] 2 days, and then [every] week.[4] Prescription done for Keflex. He received tetanus vaccine at the hospital. See discharge papers."[5] (FAC at 12 (July 9, 2012 Bureau of Prisons Health Services Clinical Encounter Report).) In the "Disposition" field, PA Joaquin wrote, "Follow-up in 48-72 hours." (Id. at 13.) This report was cosigned by Dr. Bussanich on July 10, 2012.

After he returned from the hospital, Correa spent five days in the SHU's "one-man cells or super max" and then approximately one month in a SHU two-man cell. (Id. at 9.) MCC staff "gave [Correa] the medicine in [his] possession and the medication lasted for approximately 10 days." (Id.) Correa, however, was not seen by a PA for 23 days, despite his repeated requests to correctional officers to call medical staff to come see him. Correa's stitches caused him discomfort and, on August 1, 2012, "the evening shift PA (Jane Doe) took out a piece of the stitches because it was bothering me and was too long. I did not see a PA after that for these issues." (Id.) Correa has permanent scars on his face that cause him pain when they are pressed. He states that he is "permanently deformed" and, as a result, has suffered "mental anguish" and "depression." (Id. at 3, 9.)

---

[4] Where the Court has modified PA Joaquin's notes to say "every," the original report uses the term "Q." "Q" is shorthand for *quaque*, the Latin word for "every" or "each," and is routinely used in medical notes regarding the frequency with which a treatment or procedure is to be provided. See, e.g., Carr v. Astrue, 11 Civ. 0348 (MES), 2012 WL 3129041, at *3 (S.D.W. Va. July 31, 2012); Med. Proof of Soc. Sec. Disab. 2d, *Commonly Used Medical Abbreviations*, App'x X (2014 ed.) (defining "Q" as "Every from Latin Quaque").

[5] The hospital discharge papers were not included in Correa's pleadings.

**DISCUSSION**

**I.      Standard of Review**

**A.      Federal Rule of Civil Procedure 12(b)(1)**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Phifer v. City of N.Y., 289 F.3d 49, 55 (2d Cir. 2002). In considering a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court must assume as true factual allegations in the complaint. Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). The plaintiff, however, "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Id.; Makarova, 201 F.3d at 113.

**B.      Federal Rule of Civil Procedure 12(b)(6)**

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). To state a legally sufficient claim, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). But a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555.) If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570. Further,

"complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).

Plaintiffs bringing constitutional claims against federal agents under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), must allege facts sufficient to show that all defendants, including those in supervisory roles, were personally involved in causing the alleged harm to the degree necessary to satisfy the elements of the alleged constitutional claim. See Iqbal, 556 U.S. at 676-77; accord Zappulla v. Fischer, 11 Civ. 6733 (JMF), 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013). When the claims in a Bivens action do not require the *mens rea* element of intent, as the equal protection claim did in Iqbal, a plaintiff can "survive a motion to dismiss . . . [by] alleg[ing] facts showing that a defendant was personally involved in the violation in at least one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). See Doe v. Whidden, 557 F. App'x 71, 72 n.1 (2d Cir. 2014) (declining to rule on Iqbal's effects on "the standards for establishing supervisory liability as articulated in Colon v. Coughlin"); Hernandez v. Goord, 01 Civ. 9585 (SHS), 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (quoting Qasem v. Toro, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010)) ("[E]ven after . . . Iqbal, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.'"); D'Olimpio v. Crisafi,

718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010), aff'd, 462 F. App'x 79 (2d Cir. 2012) (quoting Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009)) ("[T]he degree of personal involvement varies depending on the constitutional provision at issue . . . . 'Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply.'"); Thomas v. Calero, 824 F. Supp. 2d 488, 506 (S.D.N.Y. 2011).

In determining the sufficiency of a complaint, the Court may consider "the factual allegations in [the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass, 987 F.2d at 150. Additionally, "failure to oppose a 12(b)(6) motion cannot itself justify dismissal of a complaint." Haas v. Commerce Bank, 497 F. Supp. 2d 563, 564 (S.D.N.Y. 2007) (citing McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000)). Where the motion to dismiss is unopposed, "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." Id. at 322-23.

When the plaintiff is proceeding pro se, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]," Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted), "particularly when [the pleadings] allege civil rights violations," McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). Accord Haines v. Kerner, 404 U.S. 519, 520-21 (1972). "Even in a pro se case, however, . . . threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." <u>Chavis</u>, 618 F.3d at 170 (internal quotation marks omitted).

## II.     Subject Matter Jurisdiction

Correa brings this lawsuit under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u> ("<u>Bivens</u>"), which "established that the victims of a constitutional violation by a federal agent [acting under the color of law] have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." <u>Carlson v. Green</u>, 446 U.S. 14, 18 (1980). "Though more limited in some respects . . . , a <u>Bivens</u> action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." <u>Hartman v. Moore</u>, 547 U.S. 250, 254 n.2 (2006) (citing <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999));[6] <u>see also</u> <u>Chin v. Bowen</u>, 833 F.2d 21, 23 (2d Cir. 1987) ("<u>Bivens</u> actions are not significantly dissimilar to claims brought under . . . § 1983 in terms of the interests being protected, the relief which may be granted, and the defenses which may be asserted.") (internal quotation marks omitted). Federal courts do not have subject matter jurisdiction over <u>Bivens</u> actions brought against "federal employees acting in their official capacities [because they] are entitled to absolute sovereign immunity." <u>Griggs v. LaHood</u>, 770 F. Supp. 2d 548, 551 (E.D.N.Y. 2011); <u>see also</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 483-86 (1994); <u>Hightower v. United States</u>, 205 F. Supp. 2d 146, 155 (S.D.N.Y. 2002) ("The doctrine of sovereign immunity clearly precludes a <u>Bivens</u> action against an officer in his or her official capacity . . . .").

The defendants move to dismiss Correa's amended complaint for lack of subject matter jurisdiction "to the extent that" it asserts claims against the defendants in their official capacities

---

[6] Correa's original complaint was filed on a § 1983 form complaint, and, upon *sua sponte* dismissing Correa's complaint, the Court provided Correa another § 1983 form complaint on which he could amend amend his pleadings. Because Correa is a federal prisoner suing two federal agents, the Court construes Correa's pleadings as bringing claims under <u>Bivens</u>.

or claims under the Federal Torts Claims Act (the "FTCA") (Mot. at 5-7). The FTCA waives sovereign immunity for certain tort claims, but only where the plaintiff shows complete exhaustion and where the Attorney General has provided certification. See Celestine v. Mount Vernon Neighborhood Health Ctr., 403 F.3d 76, 80 (2d Cir. 2005) (citing 28 U.S.C. § 2679(d)(2), and 42 U.S.C. § 233(b)); Grancio v. De Vecchio, 572 F. Supp. 2d 299, 311 (E.D.N.Y. 2008). The defendants do not cite to any part of Correa's pleadings as alleging these claims.

The rule in the Second Circuit is that, when a plaintiff is *pro se*, courts must liberally construe the complaint to raise the plaintiff's strongest plausible argument. After reciting this rule, the defendants construe Correa's Bivens complaint to allege claims against defendants in their official capacities and to allege claims under the FTCA, and then ask the Court to dismiss these claims for lack of subject matter jurisdiction on the basis of sovereign immunity.

Interpreting a *pro se* complaint to allege claims that plainly are barred by a doctrine of absolute immunity is not "interpret[ing] it to raise the strongest arguments that [it] suggest[s]." Chavis, 618 F.3d at 170. Cf. Mills v. Fischer, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of 28 U.S.C. § 1915(g) [, the 'Three Strikes' provision of the PLRA]."); Flagler v. Trainor, 663 F.3d 543, 551 n.2 (2d Cir. 2011) (Calabresi, C.J., concurring) ("[W]e have held that under certain circumstances, a district court making the 'three-strikes' determination under § 1915(g) may deem a prior dismissal on account of immunity as frivolous."). There is no indication in Correa's pleadings that he intended to assert these claims, and he pleads no facts that could possibly support a federal court constitutionally hearing these claims. By asking courts to infer and then dismiss such claims where none existed, the U.S. Attorney's Office may risk working at cross-

purposes with the PLRA, a statute "intended to manage and reduce the burden of prisoner litigation on the federal courts." Diezcabeza v. Lynch, 75 F. Supp. 2d 250, 255 (S.D.N.Y. 1999).

The Court finds that Correa does not sue the defendants in their official capacities and does not allege a claim under the FTCA. The defendants' motion to dismiss under Rule 12(b)(1) should thus be DENIED AS MOOT.

## III.     Failure to Exhaust Administrative Remedies Under the PLRA

### A.     Legal Standard

The PLRA bars a prisoner from bringing an action in federal court regarding prison conditions unless the prisoner has exhausted all administrative avenues for relief within the prison system. 42 U.S.C. § 1997e(a); see Porter v. Nussle, 534 U.S. 516, 524 (2002) (stating that the PLRA's exhaustion requirement applies to federal prisoners suing under Bivens). The PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532; see also Neal v. Goord, 267 F.3d 116, 119-20 (2d Cir. 2001) (finding that claims regarding medical treatment are considered complaints about "prison conditions" and thus subject to PLRA exhaustion). Plaintiffs, however, "are not required to specially plead or demonstrate exhaustion in their complaints" because "failure to exhaust is an affirmative defense under the PLRA." Jones v. Bock, 549 U.S. 199, 216 (2007). Before a court can dismiss a prisoner's complaint for failure to exhaust administrative remedies under the PLRA, the prisoner is "entitled to notice and an opportunity to be heard." Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004).

The PLRA requires "proper exhaustion," mandating "compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90-91 (2006).

"The purpose of the exhaustion requirement is to 'provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive steps[.]'" Skyers v. United States, 12 Civ. 3432 (RWS), 2013 WL 3340292, at *7 (S.D.N.Y. July 2, 2013) (quoting Strong v. Edwards, 05 Civ. 0104, 2005 WL 2542910, at *3 (S.D.N.Y. Oct. 11, 2005). Exhaustion is required even where the prisoner "is seeking money damages, which is not an available administrative remedy." Culbertson v. Cameron, 08 Civ. 4838 (SLT)(LB), 2010 WL 1269777, at *3 (E.D.N.Y. Mar. 30, 2010) (citing Owusu v. Fed. Bur. of Prisons, 02 Civ. 0915 (NRB), 2003 WL 68031, at *1 (S.D.N.Y. Jan.7, 2003)); see also Booth v. Churner, 532 U.S. 731, 734 (2001) (holding that "an inmate seeking only money damages must complete a prison administrative process that could provide some sort of relief on the complaint stated, but no money.").

The Court of Appeals in Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), established that, when a defendant raises the affirmative defense that a plaintiff failed to exhaust his administrative remedies, the plaintiff's failure to exhaust may be excused "where (1) administrative remedies were not in fact available; (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) special circumstances . . . justify the prisoner's failure to comply with administrative procedural requirements." Adekoya v. Fed. Bur. of Prisons, 375 F. App'x 119, 121 (2d Cir. 2010) (citing Hemphill, 380 F.3d at 686).[7] "Estoppel will be found where an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." Winston v. Woodward, 05 Civ.

---

[7] The Court of Appeals has "questioned" whether Woodford v. Ngo, 548 U.S. 81 (2006), invalidates "the doctrines of estoppel and special circumstances," but has declined to rule on that issue. Amador v. Andrews, 655 F.3d 89, 102 (2d Cir. 2011); see Shariff v. Coombe, 655 F. Supp. 2d 274, 286 n.7 (S.D.N.Y. 2009) ("Although the Second Circuit has not explicitly held that Hemphill remains good law [after Woodford], it has applied the three-part inquiry in recent cases."); Messa v. Goord, 652 F.3d 305, 309 (2d Cir. 2011) (applying the three grounds for excusable non-exhaustion established in Hemphill).

3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (internal quotation marks

omitted). Thus, the Court of Appeals "has held that a plaintiff's failure to exhaust all

administrative remedies may be excused on the grounds of estoppel where the plaintiff was

misled, threatened, or otherwise deterred from fulfilling the requisite procedures." Id. (citing

Hemphill, 380 F.3d at 689). Courts have found that "special circumstances" may justify failure

to exhaust and thus withstand a motion to dismiss on non-exhaustion grounds if the prisoner's

failure was justified by his reasonable belief that he could not file a grievance or that the

procedure for doing so was different than that required by the relevant regulations. See Giano,

380 F.3d at 678; Tolliver v. Ercole, 08 Civ. 4023 (DAB)(KNF), 2009 WL 3094870, at *4-5

(S.D.N.Y. Sept. 9, 2009), report and recommendation adopted, 2010 WL 1222053 (Mar. 29,

2010).[8]

**B.    Whether Correa Sufficiently Alleges that His Failure to Exhaust
Administrative Remedies Is Excusable**

Correa concedes that he did not exhaust his administrative remedies before filing this

action. Thus, the Court considers whether Correa's failure to exhaust can be excused. According

to Correa, he spoke "to several staff members" and "asked several times about the grievance

procedure so that [he could] file a complaint." (FAC at 4-5.) While most staff members Correa

spoke to "did not show any concern," at least one told Correa "that [he] cannot file a grievance

complaint here at MCC if it had anything to do with a [l]awsuit or matters of that nature." (Id.)

The unidentified staff member then "directed [Correa] to the rules and regulations manu[a]l" to

---

[8] The three Hemphill grounds frequently overlap, and courts have inconsistently categorized similar
justifications for non-exhaustion. For example, a prisoner's reasonable but mistaken belief as to proper
grievance procedure has been categorized as "estoppel," Winston, 2008 WL 2263191, at *9; as
administrative remedies being "not available," Tolliver, 2009 WL 3094870, at *5; and as "special
circumstances," Giano, 380 F.3d at 676. Thus, propositions established in the case law regarding
excusable non-exhaustion generally are more salient to this analysis than any divisions among the
grounds or rules purported to apply to one ground exclusively.

corroborate this information. (Id.) Correa complied with these directions and referenced the manual, discovering that "it did indeed state such." (Id.) The text from the manual that he relied on states, under the heading "Administrative Remedy Process," "Complaints regarding Tort Claims, Inmate Accident Compensation, Freedom of Information or Privacy Act Requests, and complaints on behalf of other inmates are not accepted under the Administrative Remedy Procedure." (Compl. at 9.) Correa also sought help from his criminal defense lawyer on "how to proceed" with initiating the grievance process, but the lawyer told him "there was nothing [he] can do." (FAC at 5.) Correa states that his lawyer's inability to help him is documented in court papers through which Correa dismissed the lawyer for being ineffective. Correa sums up his efforts to exhaust by stating, "I spoke to officers, staff and to my lawyer but no one . . . seemed to care." (Id.)

  Correa's allegations can be construed to implicate any and all of the three grounds to excuse non-exhaustion established in Hemphill, though are most consistent with the prevailing application of "special circumstances." In Giano v. Goord, the plaintiff erroneously believed that his complaints were not grievable based on the wording of a directive adopted by the New York Department of Correctional Services ("DOCS"). The Court of Appeals found that Giano's belief was "hardly unreasonable" in light of the directive's ambiguity as to grievable and non-grievable matters. Giano, 380 F.3d at 679. Thus, the court found that the plaintiff pled facts that, if true, were sufficient to show that his failure to exhaust before filing suit "was justified by his reasonable belief that DOCS regulations foreclosed such recourse." Id. at 678.

  In Tolliver v. Ercole, the prisoner filed a grievance but received a response stating "that his issues were non-grievable" and directing him to a DOCS directive. 2009 WL 3094870, at *5. The court, invoking the language of Hemphill's first excusable ground, found that these alleged

facts that, if true, were sufficient to excuse non-exhaustion: "Following the rationale of <u>Giano</u>, and taking the plaintiff's contentions as true and drawing all reasonable inferences in his favor, it appears administrative remedies were not 'available' to the plaintiff, since [the plaintiff] was told his concerns were 'non-grievable' pursuant to [a DOCS] directive. . . ." <u>Id.</u> at *5. The court concluded, "Here, the plaintiff was advised specifically that DOCS Directive 4040 foreclosed his use of the three-tier grievance process. Therefore, it is inappropriate and unreasonable to grant the defendants' motion for dismissal on the basis of the plaintiff's failure to exhaust administrative remedies." <u>Id.</u>; <u>see also</u> <u>Hemphill</u>, 380 F.3d at 689-90 (finding the plaintiff's excuse for failure to exhaust potentially meritorious where the plaintiff erroneously but reasonably interpreted a DOCS regulation he found unclear); <u>Rodriguez v. Westchester County Jail Corr. Dep't</u>, 372 F.3d 485 (2d Cir. 2004) (refusing to reconsider reversal of summary judgment order issued against the plaintiff, finding that "[the plaintiff's] own prior understanding of the statute, even though ultimately determined to be incorrect, was a justification for not pursuing available remedies") (internal quotation marks and citation omitted).

<u>Tolliver</u> presents the strongest facts of these cases, as the plaintiff was first misled by a prison employee about whether he could file a grievance, and then reasonably, but incorrectly, relied on an apparently corroborative DOCS directive. Here, like in <u>Tolliver</u>, Correa was told that his complaints were non-grievable and was then directed to an official source to support that proposition, which Correa consulted and interpreted to confirm that his complaints were in fact non-grievable. Correa's interpretation was reasonable given that the manual said "Complaints regarding Tort Claims . . . are not accepted under the Administrative Remedy Procedure." It was reasonable for Correa to understand this sentence as barring his claims from the administrative remedy process. In his amended complaint, Correa uses and quotes language derived from

Supreme Court cases bearing directly on his grievances in this case. (See FAC at 8.) It is likely that Correa found this "deliberate indifference" language in cases or secondary sources that also use the term "constitutional torts." See, e.g., Farmer v. Brennan, 511 U.S. 825 (1994) (regarding failure to protect and deliberate indifference); City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) (regarding failure to provide medical care); Civil Actions Against the United States, Its Agencies, Officers and Employees, Ch. 3, *Actions to Recover for Constitutional Torts*, (2d ed.). It was thus reasonable for Correa to assume that the language, "Complaints regarding Tort Claims . . . are not accepted under the Administrative Remedy Procedure," meant that his complaints regarding his constitutional tort claims would not be accepted under the BOP's Administrative Remedy Procedure. Further adding to Correa's belief that he could not submit a grievance, Correa was not provided with any information after seeking help from officers, staff members, and his lawyer. Thus, Correa not only alleges facts showing that his non-exhaustion may have been justified by his reasonable interpretation of the manual, but he also alleges facts to show he may have been "misled . . . or otherwise deterred from fulfilling the requisite procedures." Winston , 2008 WL 2263191, at *9.

Additionally, the facts pled by Correa have similarities to cases excusing non-exhaustion because administrative remedies were not, in effect, "available" under Hemphill. For the purposes of surviving motions to dismiss or motions for summary judgment, courts have found that "administrative remedies were not in fact available" where an officer directed the prisoner to write to the sergeant rather than pursue the administrative grievance procedure,[9] where an officer

---

[9] Wheeler v. Goord, 03 Civ. A. 0787 (NAM)(D), 2005 WL 2180451, at *6 (N.D.N.Y. Aug. 29, 2005) (summarized and cited in Collins v. Goord, 438 F. Supp. 2d 399, 414-15 (S.D.N.Y. 2006)) to support denial of the defendants' summary judgment motion raising a failure-to-exhaust defense).

did not provide a prisoner with the requested grievance forms,[10] and where a prison official rejected the prisoner's informal claim and impeded him from filing a formal grievance.[11]

Drawing all inferences in Correa's favor and accepting his allegations as true, Correa has plead facts regarding his justification for non-exhaustion that may be sufficient to withstand the defendants' affirmative defense. He should thus be allowed to proceed with this action. The defendants' motion to dismiss should therefore be denied on the ground of failure to exhaust administrative remedies.

## IV.    Sufficiency of Correa's Allegations

### A.    Eighth Amendment Legal Standard

Correa alleges that the defendants violated his right against cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution based on the grounds of failure to protect and deliberate indifference to a serious medical need. As an initial matter, because Correa was a federal pretrial detainee rather than a convicted prisoner, the Court construes his allegations under the Due Process Clause of the Fifth Amendment, which is the proper basis for his claims. See Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (stating that the Eighth Amendment does not apply to pretrial detainees; rather, "a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody."); Lloyd v. Lee, 570 F. Supp. 2d 556, 570

---

[10] Burns v. Moore, 99 Civ. 0966 (LMM)(THK), 2002 WL 91607, at *5 (S.D.N.Y. Jan. 24, 2002) ("[I]f an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he . . . had any available administrative remedies."); Pendergrass v. Sanney, 01 Civ. 243A, 2004 WL 1946458, at *2 n.5 (W.D.N.Y. Aug. 18, 2004)) ("Where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust.").

[11] Collins, 438 F. Supp. 2d at 414-15 (denying the defendants' summary judgment motion that was based on a failure-to-exhaust affirmative defense).

(S.D.N.Y. 2008); cf. Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."); City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983). Because, however, "it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner," courts apply the same analysis under the Due Process Clause as they would under the Eighth Amendment. Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996); see also Nielsen v. Rabin, 746 F.3d 58, 63 n.2 (2d Cir. 2014) (citing Caiozzo, 581 F.3d at 72).

Under the Eighth Amendment, prison officials are required to provide humane conditions of confinement, including adequate medical care; to assume responsibility for prisoners' safety and well-being; and to treat prisoners with respect and dignity.[12] Helling v. McKinney, 509 U.S. 25, 31-32 (1993); DeShaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. 189, 199-200 (1989). "Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. 'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'" Brown v. Plata, 131 S. Ct. 1910, 1928 (2011) (quoting Trop v. Dulles, 356 U.S. 86, 100 (1958)) (internal quotation marks omitted); see also Roper v. Simmons, 543 U.S. 551, 560 (2005). "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." Brown,

---

[12] The Court refers primarily to the Eighth Amendment in this report because that is the law under which almost all relevant precedents were decided and because any distinction between the Eighth Amendment and the Due Process Clause in this context "is not material." Nielsen, 746 F.3d at 63 n.2.

131 S. Ct. at 1928. "To enforce the Constitution's protection of human dignity, this Court looks to the 'evolving standards of decency that mark the progress of a maturing society.'" Hall v. Florida, 134 S. Ct. 1986, 1992 (2014) (quoting Trop, 356 U.S. at 101).

### B.     Whether Correa States a Claim for Inadequate Medical Care

#### 1.     Legal Standard

To establish an Eighth Amendment claim based on inadequate medical care, a prisoner must allege "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Taylor v. Goorde, 548 F. App'x 696 (2d Cir. 2013). To state a claim of deliberate indifference under the Eighth Amendment, a prisoner must plead facts sufficient to "satisfy a standard that includes both objective and subjective components." Id. at 697-68. "First, the alleged deprivation must be, in objective terms, sufficiently serious." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (internal quotation marks omitted). The deprivation satisfies this standard when (1) a prison official "fail[s] 'to take reasonable measures' in response to a medical condition"; and (2) the official's failure to act reasonably and the resulting harm are "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994)).

Second, the subjective component requires the prisoner to allege sufficiently that "'the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result.'" Nielsen, 746 F.3d at 63 (quoting Salahuddin, 467 F.3d at 280). For inadequate medical treatment claims, the defendant must have a "'culpable state of mind,'" but the state of mind "'need not reach the level of knowing and purposeful infliction of harm. . . . Deliberate indifference is a mental state equivalent to subjective recklessness.'" Id. (quoting Salahuddin, 467 F.3d at 280). While the mental state for deliberate indifference "entails more

than mere negligence," it does not require that the official act "intentionally" and with "desire to cause . . . harm," or that the official is "aware that such harm will surely or almost certainly result." Salahuddin, 467 F.3d at 280.

A plaintiff must also allege facts sufficiently to show that a defendant, regardless of rank or level of responsibility, personally took actions that satisfy the above elements of deliberate indifference. See Colon, 58 F.3d at 873 (listing five theories on which a defendant can be found personally involved in constitutional violation based on deliberate indifference); D'Olimpio, 718 F. Supp. 2d at 347 (finding that Colon's analysis should be applied to Eighth Amendment claims of deliberate indifference); cf. Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) ("[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."); Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010) (finding that a supervisor can be held liable if the supervisor "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" that causes a constitutional tort).

### 2.    Application

First, the Court must assess whether the alleged deprivation was sufficiently serious. Correa alleges facts capable of showing that prison officials failed to take reasonable measures in response to his medical condition. After being slashed in the face with a razorblade, Correa waited in the SHU for approximately 40 minutes before medical staff took action to stop the bleeding and apply bandages. He was then taken to the emergency room, where he received 65 stitches on his face and behind his ear, was given a tetanus shot, and was prescribed an antibiotic used to treat bacterial infections. Afterwards, PA Joaquin wrote and submitted a report to Dr. Bussanich referring to the hospital discharge papers and stating that Correa needed a "wound

check" every two days, and then every week, and needed follow-up care in the next two to three days. The report also noted that the stitches Correa received were absorbable. Dr. Bussanich cosigned the report. No PA or doctor attended to or checked on Correa for over three weeks after the day of his injuries and hospitalization. He was immediately placed in a "super max" one-man cell in the SHU for five days and then moved to a two-man SHU cell for approximately one month. Correa asked SHU correctional officers to call for medical staff, but no one came. When Correa did finally make contact with an unidentified PA on August 1, 2012, she "took out a piece of the stitches," which were supposed to be absorbable, but provided no further care. This was the one and only time Correa was seen by a PA after the day he received 65 stitches on his face.

By failing to have a PA visit Correa for 23 days despite the medical instructions for frequent "wound checks" and follow-up care within 48-72 hours, and despite Correa's requests to officers for medical attention, MCC officials failed to take reasonable measures in response to his injuries. Almost a year after the attack, Correa's facial scars were still causing him pain. Correa does not allege to what extent, if any, his lingering pain was caused by the inadequate medical care, or to what extent, if any, the inadequate medical care exacerbated his facial disfigurement beyond what it would have been with adequate care. Nevertheless, drawing all inferences in Correa's favor, the amended complaint plausibly alleges that inadequate medical care was at least in part responsible for some of the harm. Given the nearly complete lack of medical attention alleged, the Court finds that the combination of the failure to act reasonably and the resulting harm are "sufficiently serious." Therefore, Correa has pled facts sufficient to satisfy the objective component of deliberate indifference.

With respect to the subjective component of deliberate indifference, Correa alleges sufficiently that MCC officials "fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." <u>Nielsen</u>, 746 F.3d at 63 (internal quotation marks omitted). Although MCC officers, including at least PA Joaquin and Dr. Bussanich, were aware of Correa's serious injuries and of the Downtown Hospital surgeon's opinion that Correa needed his wounds checked every two days and then every week, Correa alleges that no wound checks or any type of follow-up evaluation were ever performed, even after a PA learned that, 23 days after his injuries, his stitches were causing him pain and apparently not absorbing as intended.

With respect to alleging the defendants' personal involvement, Correa plainly fails to plead facts capable of showing that Hastings and Johnson were personally involved in the constitutional violation under any of the <u>Colon</u> categories. Correa does allege facts, however, that may be sufficient to plausibly allege the personal involvement of members of MCC's medical staff, either through direct participation in not providing for follow-up care or grossly negligent supervision if a subordinate was assigned to provide follow-up care but failed to do so. Correa, however, does not allege claims against any MCC medical employees. Correa's claim of deliberate indifference to his serious medical condition should therefore be dismissed because the claim is alleged only against Warden Hastings and Supervisor Johnson.

### 3.    Leave to Amend

"Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." <u>Nielsen</u>, 746 F.3d at 62 (internal quotation marks omitted). "'A *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'" <u>id.</u> (quoting <u>Chavis</u>, 618 F.3d

at 170). "Where the 'problem with [a complaint] is substantive [and] better pleading will not cure it,' leave to amend should be denied as futile." Leary v. Civil Serv. Employees Ass'n, 11 Civ. 716 (CS), 2012 WL 1622611, at *12, aff'd, 516 F. App'x 42 (2d Cir. 2013) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)) (alterations in Leary).

Correa was granted leave to amend after his original complaint was dismissed *sua sponte*. In compliance with that dismissal order, Correa added substantial detail and documentation to his First Amended Complaint. The dismissal order did not consider whether Correa might have claims against any defendants other than Hastings and Johnson and did not advise Correa to allege any additional facts in relation to other potential defendants. Correa should be granted leave to amend with respect to his medical deliberate indifference claim so that he may, among other things, consider adding new defendants. To the extent possible, upon preparing his second amended complaint, Correa should consider (1) attaching the Downtown Hospital discharge papers; (2) clarifying the process by which staff dispensed his Cephalexin and clarifying the involvement of medical staff in this process (for example, stating whether he was provided the Cephalexin all at once or whether it was dispensed on a daily basis over the course of 10 days, and stating whether the contacts with staff during which he received the Cephalexin involved any other form of medical evaluation or follow-up care); (3) clarifying why he requested that the SHU correctional officers call medical staff and stating approximately how many times he made such requests; (4) identifying any officers to whom he made these requests to call medical staff and whether those officers in fact made the call; and (5) identifying any other MCC staff members to whom he made complaints or requests regarding his medical treatment.

### C.        Whether Correa States a Claim for Failure to Protect

#### 1.        Legal Standard

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 832). "Accordingly, '[i]t is settled that, under the Eighth Amendment, prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" Randle v. Alexander, 960 F. Supp. 2d 457, 471 (S.D.N.Y. 2013) (quoting Hines v. Lacy, 98 Civ. 2961, 189 F.3d 460, 1999 WL 642915, at *3 (2d Cir. Aug. 20, 1999) (unpublished table)). To withstand a Rule 12(b)(6) motion to dismiss, a "failure to protect" claim under the Eighth Amendment or Due Process Clause must satisfy the objective and subjective components of a deliberate indifference test similar to the test for inadequate medical care. See id.; Bridgewater v. Taylor, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010). "For the objective component . . . , 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" Randle, 960 F. Supp. 2d at 473 (quoting Farmer, 511 U.S. at 845). There must be "a condition of urgency" that "grave harm is 'actual or imminent.'" Dublin v. New York City Law Dep't, 10 Civ. 2971 (LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting Benjamin v. Fraser, 343 F.3d 35, 51 (2d Cir. 2003)) (internal quotation marks omitted). A substantial risk of harm is more likely to be found "where there is evidence of a previous altercation between a plaintiff and his attacker." Dublin, 2012 WL 4471306, at *5.

"Additionally, subjectively, 'the prison official [must] have a sufficiently culpable state of mind, to wit, be deliberately indifferent to the harmful conditions.'" Randle, 960 F. Supp. 2d at 473 (quoting Farmer, 511 U.S. at 845). Under the subjective prong, "the prison official must have 'ha[d] knowledge that an inmate face[d] a substantial risk of serious harm and he

disregard[ed] that risk by failing to take reasonable measures to abate the harm.'" JCG v. Ercole, 11 Civ. 6844 (CM)(JLC), 2014 WL 1630815, at *25 (S.D.N.Y. Apr. 24, 2014), report and recommendation adopted, 2014 WL 2769120 (June 18, 2014) (quoting Hayes, 84 F.3d at 620).

### 2. Application

Correa claims that a substantial risk of harm to all prisoners in his MCC unit was created by official policies of providing all prisoners with a type of razor (the "orange razors") from which prisoners could remove the blade with little difficulty. According to Correa, his unit did not monitor the dispensing of these razors even though other units at MCC did. This resulted in "slashings and cuttings . . . re-[o]ccurring on a consistent basis" and "numerous weapons being made to violently attack other inmates." (FAC at 8.) Correa states that the policies and failure to enact monitoring or security measures resulted in "acts of violence" that caused injuries to "others in the past" similar to Correa's, including "permanent disfigurement." (Id. at 5.) Correa claims that the defendants, Hastings and Johnson, were aware of the ongoing danger created by the razorblade policies or lack thereof.

Correa fails to allege facts sufficient to satisfy either the objective or subjective components of deliberate indifference for a failure to protect claim. While the facts he alleges are plausible and more than "threadbare recitals" of the elements supported by "conclusory statements," they lack a sufficiently specific factual basis. Correa's claim as to Hastings and Johnson's personal involvement are even more deficient and lack any specific allegations or factual basis. Therefore, Correa's claim for failure to protect should be dismissed.

### 3. Leave to Amend

Applying the same standard for leave to amend as stated with respect to his inadequate medical care claim, the Court recommends that Correa be granted one more opportunity to

amend his failure to protect claim. When amending his complaint, Correa should be as specific as possible in the facts he alleges and, for events that he did not personally witness, should state a reason for believing those facts to be true. Regarding the objective component of deliberate indifference, Correa should consider (1) alleging any relevant past interactions with the prisoner who attacked him on July 9; (2) specifically describing past incidents of prisoner-on-prisoner attacks using blades removed from the orange razors; and (3) identifying the policies, safety measures, or monitoring procedures that are implemented in other MCC units but not in Correa's unit. With respect to the subjective component and personal involvement requirement, Correa should consider alleging specific facts as to which MCC employees were aware of the problem of razorblade attacks and which employees were involved in the creation of razor policies or involved in the decision to not implement such policies as were implemented in other MCC units. Correa should also state his basis for believing these facts to be true, that is, how he knows these alleged facts.

Because Correa's failure to protect claim is not clearly futile, he should be granted leave to amend the claim to add more specificity and a clearer factual basis for his allegations. See Nielsen, 746 F.3d at 62; Chavis, 618 F.3d at 170. Correa is advised, however, that, in light of the guidance provided in the Court's *sua sponte* dismissal order regarding this claim and his failure to add substantive and specific responsive facts in his First Amended Complaint, the Court will be disinclined to grant any further opportunities for Correa to amend this claim.

## CONCLUSION

For these reasons, I recommend that the defendants' motion to dismiss under Rule 12(b)(1) be DENIED; their motion to dismiss under Rule(b)(6) be GRANTED; and that Correa be granted LEAVE TO AMEND.

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS**
**TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
           July 16, 2014

cc:     Jose M. Correa (*By Chambers*)
        Reg. No. 66711-054
        FCI Ray Brook
        Federal Correctional Institution
        P.O. Box 900
        Ray Brook, NY 12977